UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KEITH BROWN,

                Plaintiff,

      v.

CSX TRANSPORTATION INC.,
MICHAEL LEWANDOWSKI, and
THOMAS FERRIS, JR.,

                Defendants.

_____

**DECISION AND ORDER**

1:11-CV-00999 EAW

## INTRODUCTION

Plaintiff Keith Brown ("Plaintiff"), an African-American male, commenced this employment discrimination action on November 22, 2011, alleging that Defendants CSX Transportation, Inc. ("CSX"), Michael Lewandowski, and Thomas Ferris, Jr. (collectively "Defendants") discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); and the New York State Human Rights Law, New York Executive Law §§ 290 *et seq.* ("NYSHRL"). (Dkt. 1; Dkt. 7).

This case was initially assigned to the Hon. Richard J. Arcara, United States District Judge. On June 21, 2012, Judge Arcara entered an order referring this matter to the Hon. Leslie G. Foschio, United States Magistrate Judge, for hearing and disposition

of all non-dispositive motions or applications, supervision of discovery, and to hear and report upon dispositive motions. (Dkt. 14).

Defendants filed a motion for summary judgment on January 21, 2014. (Dkt. 43). Plaintiff opposed the motion. (Dkt. 49). This case was transferred to the undersigned on January 30, 2015. (Dkt. 53). On April 20, 2015, Judge Foschio issued a Report and Recommendation recommending the Court grant summary judgment and dismiss Plaintiff's complaint. (Dkt. 54).

On June 4, 2015, Plaintiff filed objections to the Report and Recommendation. (Dkt. 57). Plaintiff contends that he has established a material question of fact with respect to the fourth element of the *prima facie* case for his employment discrimination claims and that the Report and Recommendation erred in finding no individual liability with respect to Defendant Lewandowski under N.Y. Exec. Law § 296. (*Id.*). On July 2, 2015, Defendants filed a response to Plaintiff's objections. (Dkt. 59). In addition to responding to Plaintiff's objections, Defendants posit that there are additional grounds for summary judgment not recognized in the Report and Recommendation, including Plaintiff's failure to demonstrate that he was qualified for his position in satisfaction of the second prong of any *prima facie* case, and that additional training was not an adverse employment action. (*Id.*).

The Court held oral argument on October 28, 2015. After considering the record before the Court and the arguments of the parties, the Court adopts the dispositions recommended in the Report and Recommendation, although some of this Court's reasoning is slightly different from that contained in the Report and Recommendation.

For the reasons set forth below, Defendants' motion for summary judgment (Dkt. 43) is granted and Plaintiff's complaint (Dkt. 1) is dismissed with prejudice.

## BACKGROUND

The factual and procedural background of this case is set forth in detail in the Report and Recommendation. (*See* Dkt. 54 at 4-11). Familiarity with the Report and Recommendation is assumed for purposes of this Decision and Order.

## DISCUSSION

### I.   Standard of Review

"Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made." *Crowe v. Leroy Cent. Sch. Dist.*, 949 F. Supp. 2d 435, 438 (W.D.N.Y. 2013). "The Court reviews unobjected-to findings for clear error." *Am. Ins. Co. v. City of Jamestown*, 914 F. Supp. 2d 377, 384 (W.D.N.Y. 2012).

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no

rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007)

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986)).

Once the moving party has met its burden, the opposing party "'must do more than

simply show that there is some metaphysical doubt as to the material facts. . . .  [T]he

nonmoving party must come forward with specific facts showing that there is a *genuine*

*issue for trial*.'"  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting

*Matsushita Elec.*, 475 U.S. at 586-87) (emphasis in original).  "[T]he mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment. . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986) (emphasis in original).

## II.    Title VII Claim[1]

"To state a prima facie case of race discrimination, a plaintiff must proffer

evidence that (1) he belongs to a protected group; (2) he was qualified for his position;

(3) his employer took an adverse action against him; and (4) the adverse action occurred

in circumstances giving rise to an inference of race discrimination."  *Kirkland v.*

*Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014).  Race discrimination claims are

assessed using the burden-shifting framework established by the United States Supreme

Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  As explained by the

Second Circuit Court of Appeals:

---

[1]    As noted in the Report and Recommendation (Dkt. 54 at 30), Title VII does not
provide for liability against individuals, and therefore Plaintiff's Title VII claims as
against Defendants Ferris and Lewandowski are dismissed.  *See Spiegel v. Schulmann*,
604 F.3d 72, 79 (2d Cir. 2010) ("[T]he remedial provisions of Title VII . . . do not
provide for individual liability.").

[o]nce a plaintiff has established a prima facie case of . . . discrimination, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse act]. If the defendant carries that burden, the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. However, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498-99 (2d Cir. 2009), *superseded by statute on other grounds*, N.Y.C. Local L. No. 85, *as recognized in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108-09 (2d Cir. 2013) (internal quotations and citations omitted) (alteration in original).   "[T]hough the burden upon a plaintiff attempting to establish a *prima facie* case may be 'minimal,' it remains a burden nonetheless, and summary judgment may be granted against a plaintiff who fails to meet this burden." *Tuccio v. FJC Sec. Servs., Inc.*, No. CV 12-5506(JFB)(GRB), 2014 WL 4438084, at *6 (E.D.N.Y. Aug. 18, 2014). "It is well settled that 'a plaintiff's mere subjective belief that he was discriminated against because of his race does not sustain a race discrimination claim.'"   *Id.* at *7 (E.D.N.Y. Aug. 18, 2014) (quoting *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625 (MKB), 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013)).

## A.   Protected Group

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national group."   42 U.S.C. § 2000e-

2(a)(1).  The parties do not contest that, as an African-American male, Plaintiff is a member of a protected group.  (Dkt. 43-23 at 8; Dkt. 49 at 10).

## B.   Qualified for His Position

"[T]he second prong only requires plaintiff to demonstrate that he was 'qualified for the position he held,' with a focus on his 'competence and whether he possesses the basic skills necessary for performance of the job.'" *Payne v. N.Y.C. Police Dep't*, 863 F. Supp. 2d 169, 180 (E.D.N.Y. 2012) (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010)).  "[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001).

The Report and Recommendation found that there was a "genuine issue of material fact on which a reasonable jury could conclude that Plaintiff was qualified for the conductor position from which he was terminated. . . ." (Dkt. 54 at 20).  Defendants maintain that Plaintiff failed to demonstrate that he was qualified for his position, and thus failed to satisfy the second prong of his *prima facie* case.  (Dkt. 59 at 17).  Specifically, Defendants contend that Plaintiff never passed his lines east qualification test, and was therefore not qualified for his position.  (*Id.*).

Although Plaintiff never successfully completed the lines east qualification test, Plaintiff successfully completed training at the Railroad Education and Development Institute ("REDI training"), rules classes, and qualifying rides.[2]  (Dkt. 43-4 at 61:7-21;

---

[2]    The Report and Recommendation notes Plaintiff's claim that he "scored a perfect 100% on a lines east physical characteristics test he took on February 26, 2009. . . ."

Dkt. 49-3 at ¶¶ 5, 11, 16; Dkt. 49-4 at ¶ 6).  In addition, before taking medical leave, Plaintiff had worked as a conductor for Defendant CSX for approximately three years, indicating he possessed the basic skills necessary for the job.  *See Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("by hiring the employee, the employer itself has already expressed a belief that [he] is minimally qualified").  This at least raises issues of fact as to whether Plaintiff had the basic skills required for the conductor position.  The Court agrees with the Report and Recommendation that a reasonable jury could find that Plaintiff was qualified for the conductor position from which he was terminated and has thus met his minimal burden with respect to the second element of his *prima facie* case.

### C.    Adverse Employment Action

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  "Examples of a change include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'"  *N.Y.C. Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).  "An adverse employment action is one which is 'more

---

(Dkt. 54 at 19).  There is a question of fact as to whether Plaintiff took the same physical characteristics test in November 2009 as in February 2009.  Although Plaintiff claims that he scored 100% on a February 2009 physical characteristics test (Dkt. 57-2 at 5; Dkt. 50-6 at 1), Defendant Ferris testified that the February test was a "PODS test" that was comprised of 10 questions and administered on the computer, as compared to the 50 question lines east written examination that was administered to Plaintiff in November 2009 (Dkt. 51-7 at ¶¶ 2-7).

disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 176 (E.D.N.Y. 2013) (quoting *Brown*, 673 F.3d at 150).    The parties agree that Plaintiff sustained an adverse employment action when he was terminated from employment. *See Terry*, 336 F.3d at 138 (listing "termination of employment" as an example of an adverse employment action). However, the parties contest whether the REDI training, qualifying trips, and lines east test Plaintiff was required to complete constituted additional adverse employment actions.

      **1.**    **REDI Training**

Plaintiff claims that although he was medically cleared to return to work in May 2009, the additional testing, training, and qualifying trips that he was required to complete caused him to go without pay for approximately six months. (Dkt. 43-2 at 22, 25-26, 37-38, 44, 106; Dkt. 49-3 at ¶¶ 5, 14-15, 23).  The Report and Recommendation found this loss of wages may be construed as an adverse employment action in light of Defendants' failure to explain what criteria was considered in requiring Plaintiff to attend REDI training or take the lines east test. (Dkt. 54 at 22).

Defendants object to the Report and Recommendation finding that REDI training – the week-long training that CSX required Plaintiff to complete after his extended absence – could also constitute an adverse employment action. (Dkt. 59 at 18).  They argue that the REDI training was not a punishment and was "required for over one hundred other employees in the Albany and Great Lakes Divisions after extended leaves of absence from 2008 to 2011." (Dkt. 59 at 18-19; Dkt. 43-15 at ¶ 15).

Upon *de novo* review, the Court disagrees with the Report and Recommendation to the extent it concluded that requiring Plaintiff to attend REDI training, standing alone, was an adverse employment action.

Generally, "[e]mployer-provided training is a benefit of employment under Title VII protection," *Ani v. IMI Sys.*, No. 98Civ.8430(DAB)(MHD), 2002 WL 1888873, at *6 (S.D.N.Y. Aug. 15, 2002), such that <u>denial of the training</u> may constitute an adverse employment action. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) ("Denial of training can constitute an adverse employment action where it bears on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation.") (quotation omitted); *Little v. NBC*, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002) (noting "denial of training" may constitute an adverse employment action). By contrast, courts typically find that <u>requiring an employee to attend training</u> is not considered an adverse employment action. *See Davis v. Joseph J. Magnolia, Inc.*, 815 F. Supp. 2d 270, 276 (D.D.C. 2011) (requiring plaintiff to attend safety training course was not an adverse employment action); *Soloski v. Adams*, 600 F. Supp. 2d 1276, 1356 (N.D. Ga. 2009) (finding the requirement for an employee to attend sexual harassment training was not an adverse employment action, as "such a requirement does not impact the terms, conditions, or privileges of the plaintiff's job in a real and demonstrative way."); *Pittman v. Montgomery Cnty. Sheriff's Dep't*, No. 206-CV-507-WKW, 2007 WL 2429210, at *4 (M.D. Ala. Aug. 22, 2007) ("The training Pittman was required to attend is not in itself an adverse employment action and the training itself did not lead to Pittman's termination.").

Particularly here, where Plaintiff had not previously attended REDI training (Dkt. 43-2 at 25:20-21), and was required to attend to ensure that he could safely perform his duties as a railroad conductor after being absent from work for more than a year, no reasonable jury could conclude that the REDI training was an adverse employment action. *See Burns v. City of Utica*, 590 F. App'x 44, 49 (2d Cir. 2014) ("Finally, the fact that Burns was required to undergo remedial training after missing so much work was not an adverse action. Rather, requiring such training was a reasonable safety precaution to ensure that Burns could perform her duties as a firefighter after being absent from work for several months.").

Additionally, although Plaintiff contends that the requirement that he attend REDI training contributed to him going without pay for approximately six months, the record demonstrates that CSX initially scheduled Plaintiff for the one-week REDI training course commencing June 15, 2009, following his medical clearance to return to work on May 20, 2009. (Dkt. 43-22 at ¶¶ 8, 11; Dkt. 49-2 at ¶¶ 8, 11). Plaintiff admits that the morning of June 15, 2009, he cancelled his attendance for this training and was rescheduled to attend training beginning July 5, 2009. (Dkt. 43-2 at 27:5-23-28:1-14; Dkt. 43-4 at 73:21-23-74:1-13; Dkt. 43-9 at ¶¶ 9-11; Dkt. 43-22 at ¶ 11; Dkt. 49-2 at ¶ 11). In other words, the REDI training was completed by Plaintiff less than two months after he was medically cleared to return to work, but could have been completed even sooner if Plaintiff attended the training when it was initially scheduled by CSX. The training itself lasted approximately one week and was originally scheduled within weeks of Plaintiff's return to work. (Dkt. 43-2 at 26:9-20; Dkt. 49-3 at ¶¶ 7-11; Dkt. 49-4 at

¶¶ 5-6). In other words, the REDI training did not cause any substantial delay in returning Plaintiff to work, Plaintiff passed the REDI training, and it had no bearing on the termination of Plaintiff's employment. (*See* Dkt. 43-11). Under the circumstances, the Court concludes that a reasonable juror could not find that requiring Plaintiff to attend REDI training constituted a separate or discrete adverse employment action. *Cf. Hudson v. Greyhound Lines, Inc.*, No. 04-CV-1028S, 2008 WL 819687, at *8 (W.D.N.Y. Mar. 25, 2008) ("Moreover, not only did Greyhound schedule Plaintiff's return to work, it gave him three separate opportunities to comply with the requirements for his return. It was Plaintiff who chose not to appear for his scheduled physical examinations, which ultimately resulted in his termination.").

### 2.     Qualifying Trips and Lines East Test

On the other hand, the Court adopts the Report and Recommendation to the extent it found that there are disputed issues of material fact as to whether the additional obstacles Plaintiff was required to overcome to be reinstated to his position as conductor may constitute an adverse employment action, as the continued delay in reinstatement following Plaintiff's successful completion of the REDI training resulted in lost wages for a period of several months. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (where plaintiff was suspended for a week without pay and was not reimbursed until "some time later," plaintiff suffered the loss of the use of her wages for a time, and this was sufficient to support a jury's finding that she suffered an adverse employment action); *White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789, 802 (6th Cir.

2004) ("Taking away an employee's paycheck for over a month is not trivial, and if motivated by discriminatory intent, it violates Title VII.").

Although Plaintiff was medically cleared to return to work in May 2009, the required qualifying trips and testing that Plaintiff was required to complete following the completion of REDI training caused Plaintiff to go without pay for several additional months. (Dkt. 43-2 at 22, 25-26, 37-38, 44, 106; Dkt. 49-3 at ¶¶ 5, 14-15, 23). The Report and Recommendation found this loss of wages may be construed as an adverse employment action in light of Defendants' failure to explain what criteria was considered in requiring Plaintiff to overcome these additional obstacles. (Dkt. 54 at 22).

Following REDI training in July 2009, Defendant Ferris informed Plaintiff that he needed to take qualifying trips to re-familiarize himself with the routes. Plaintiff took approximately 15 qualifying trips. (Dkt. 43-2 at 38:4-7). Plaintiff testified that Defendant Ferris did not give Plaintiff a specific number of trips he was required to take, rather, he "was instructed to take trips, and when [he] felt comfortable on the territory, then [he] was to report back to [Defendant Ferris]." (*Id.* at 38:15-23).

Plaintiff testified that after he took his qualifying trips, Mr. Ferris informed him that he needed to take the lines east test. (*Id.* at 40:18-23). He then contacted his Union Representative Mr. McVeen to complain that he was "not being put back to work in a timely manner." (*Id.* at 39:4-21).

Plaintiff's lines east test was scheduled for November 24, 2009. (Dkt. 43-22 at ¶ 20; Dkt. 49-2 at ¶ 20). Plaintiff claimed that he was only scheduled to take the lines east test that one time in November 2009. (Dkt. 43-2 at 41:6-9).

By contrast, Defendant Ferris testified that he gave Plaintiff the lines east test after one of his rules classes, but Plaintiff "signed his name on the paper, filled out one, maybe two answers, and reviewed through the packet and then threw the test at [Defendant Ferris] and said he couldn't do it." (Dkt. 43-4 at 49:13-22). Plaintiff did not recall attempting to take the test before November 2009. (Dkt. 43-2 at 41:11-17). Defendant Ferris stated that he required Plaintiff to take two qualifying trips after Plaintiff failed that lines east test. (Dkt. 43-4 at 60:12-23-61:1-3). He further stated that Plaintiff was not reinstated after the qualifying trips because he still needed to pass the lines east test. (*Id.* at 61:16-21).

Defendant Ferris testified that he "tried several times to schedule a test for Mr. Brown." (*Id.* at 73:3-6). He stated that any delay in scheduling the test was a result of Plaintiff's actions. (*Id.* at 73:21-23-74:1). He further testified: "I called Mr. Brown on several occasions, to which I got no return phone calls or responses. I was able to make contact with him a couple of times eventually, to what the [ ] time period is, I don't know. But Mr. Brown stated that he had a fire at one of his rental properties and was not able to come. I believe I waited two weeks, tried Mr. Brown again, to no response, to which then he said he had a surgery of some sort, couldn't come in." (*Id.* at 74:3-13).

When questioned at his deposition, Plaintiff did not recall informing Defendant Ferris that he had not communicated with him because of a problem with a fire at a rental property. (Dkt. 43-2 at 41:18-23). Plaintiff did testify that he had a fire at one of his rental properties in 2009. (*Id.* at 42:1-14).

According to Defendant Ferris, the lines east test is offered every day. (Dkt. 43-4 at 74:14-17). There was no penalty for taking the test many times, and there was no limit to the number of times an employee could take the test. (*Id.* at 79:11-23). When asked what percentage of employees who returned as conductors after being off for one year were required to complete the physical characteristics exam, Defendant Lewandowski testified that he would not know the "exact number," but "all of them if they were going through [him]." (Dkt. 43-5 at 15:10-18). Defendant Lewandowski further testified that this was "standard practice." (*Id.* at 21:5-9).

Although Defendants have claimed that similar training is required for any employee returning from an extended absence (Dkt. 43-4 at 42-43; Dkt. 43-5 at 15-16), they have not been able to point to any written or established policy for these requirements, and Plaintiff contests that there was any such policy (Dkt. 43-4 at 47). In addition, Plaintiff has produced the affidavit of Union Representative Richard McVeen, testifying that Plaintiff "had sufficient seniority to work any conductor assignment of his choosing, including working in the yard which did not require a lines test." (Dkt. 49-4 at ¶ 12). In all, these factual disputes concerning the requirement that Plaintiff take qualifying trips and complete the lines east test, when considered in the context that it resulted in the loss of several months of wages, means that Plaintiff has met his minimal burden to show that retraining and retesting requirements may have been an adverse employment action.

In sum, although Plaintiff suffered an adverse employment action when he was terminated, the requirement that Plaintiff attend REDI training did not itself constitute an

additional adverse employment action.  However, there is a question of fact as to whether the requirement that Plaintiff participate in additional training and testing in the months after the REDI training constitutes an adverse employment action.

**D.    Circumstances Giving Rise to Inference of Race Discrimination**

"Direct evidence of discrimination is not necessary . . . [i]f there is sufficient circumstantial evidence on which to build a case, it is for the jury to determine what inferences can be drawn from that evidence." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) (internal citations omitted).  "[A] showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group . . . is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation omitted).  "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz*, 609 F.3d at 493-94 (quotations omitted).  "'[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.'" *Id.* at 494 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)).  "[T]he comparator must be similarly situated to the plaintiff 'in all material respects.'" *Id.* (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).

Plaintiff admits there is no direct evidence of race-based employment discrimination, but contends there is sufficient circumstantial evidence of discrimination

by disparate treatment as compared to similarly situated employees to survive a summary judgment motion. (Dkt. 49 at 14-15).

### 1.   REDI Training

Upon *de novo* review of the record, the Court identified at least seven Caucasian conductors who were absent for a period of time of at least 18 months who were not required to attend REDI training. (Dkt. 43-5 at 38-40; Dkt. 45; Dkt. 50-2 at 87, 90-91, 94, 101-02, 106-07). The record is not clear as to whether these Caucasian conductors could be characterized as similarly situated to Plaintiff in all material respects.

However, as discussed above, the requirement that Plaintiff attend REDI training was not, in and of itself, an adverse employment action. As a result, the potential disparate treatment of requiring Plaintiff to attend REDI training while Caucasian conductors were not required to attend the training is not, under the circumstances of this case, sufficient to raise an inference of discrimination. In other words, even if other similarly situated employees were not required to complete REDI training, the REDI training was not an adverse employment action sufficient to support a *prima facie* case of race discrimination. *See Staff v. Pall Corp.*, 233 F. Supp. 2d 516, 535 (S.D.N.Y. 2002) ("The real issue with respect to this claim is the fourth and final element of the prima facie case – whether the employment action in question gives rise to an inference of racial discrimination.").

### 2.   Qualifying Trips and Lines East Test

Plaintiff claims that he has sufficiently provided examples of disparate treatment insofar as "the practice of requiring REDI training and/or physical characteristics line

- 16 -

testing for similarly situated employees . . . was disproportionately exercised against African-American employees." (Dkt. 57-2 at 15).

Plaintiff argues that the delay in scheduling his lines east test and requirement that he complete qualifying trips is evidence of discrimination. (*Id.* at 18). However, Plaintiff has failed to provide any evidence to suggest that similarly situated Caucasian employees were not also required to complete qualifying trips and take the lines east test prior to returning to work after an extended absence.

In fact, with respect to the requirement that Plaintiff successfully complete the lines east test before returning to work, Defendants Ferris and Lewandowski each testified that they required any individual who was absent from work for an extended period of time to take the lines east test before returning to work. (Dkt. 43-4 at 42:17-23-43:1-5; Dkt. 43-5 at 15:10-18; Dkt. 43-5 at 21:5-9). Plaintiff has not identified any Caucasian individual who was absent for an extended period of time who was not required to take a lines east test upon returning to work. In fact, Plaintiff took his November 24, 2009 lines east exam with Steven Hrycyszyn, a Caucasian CSX conductor, suggesting that Plaintiff was treated the same as Caucasian individuals for the lines east test requirement. (Dkt. 43-5 at 37:22-23; Dkt. 49-3 at ¶ 24). Similarly, Plaintiff has not presented evidence that Caucasian employees were not required to take qualifying trips after returning from an extended absence.

### 3.    Termination for "Major Offenses"

Plaintiff further argues that his penalty of termination for alleged misconduct was "not in line with that of others who were alleged to have committed 'major offenses.'"

(Dkt. 57-2 at 17).   Plaintiff notes that CSX conductor Danny Blake, a Caucasian male, was only terminated for cheating after there was a presentation of physical evidence and an admission, whereas Plaintiff was terminated for cheating with no physical evidence or admission of guilt.   (*Id.*).   Plaintiff also identifies two other Caucasian employees who allegedly committed "major offenses" and remain employees of CSX.   (*Id.*).

With respect to Danny Blake, the fact that there was physical evidence of Mr. Blake's cheating does not change the fact that both Mr. Blake and Plaintiff had hearings on the charges and were terminated from employment.   (Dkt. 43-4 at 117-19).   Each employee was subject to a formal hearing and ultimately terminated based on charges of cheating.

As for the comparison to the two other Caucasian individuals who remain employees of CSX, the record does not contain sufficient evidence of their "offenses" for the Court to draw a comparison between Plaintiff and the individuals.   Plaintiff relies on Defendant Lewandowski's deposition testimony to argue that these individuals had committed major offenses and were still employed at CSX.  (Dkt. 57-2 at 17).   However, despite Plaintiff's counsel's best efforts to draw the testimony out at the depositions, Defendants Ferris and Lewandowski never affirmatively established whether the individuals were actually found guilty of the charges against them or if there was a penalty imposed.  (Dkt. 50-2 at 120:4-23-121:1-2; Dkt. 50-3 at 57:6-19).

Notably, Plaintiff previously committed a "major offense" in 2005 and was granted a leniency reinstatement and permitted to return to his conductor position.  (Dkt. 43-3 at 2).   In sum, Plaintiff has failed to demonstrate that he was treated less favorably

than similarly situated Caucasian employees.  In fact, based on the evidence related to Danny Blake, the record demonstrates that Plaintiff was treated the same.

For these reasons, Plaintiff has failed to produce sufficient evidence of circumstances giving rise to an inference of racial discrimination and has therefore failed to make out a *prima facie* case of racial discrimination.

### E.    Legitimate, Non-Discriminatory Reason for Adverse Action

Even if Plaintiff had established a *prima facie* case, Defendants had legitimate, non-discriminatory reasons for Plaintiff's termination and for the qualifying tests, training, and trips prior to Plaintiff's return to work.

Plaintiff was terminated following a formal hearing concerning the cheating allegations.  (Dkt. 43-8 at 2-80; Dkt. 43-11 at 2).  Plaintiff was entitled to have representation at the hearing and was able to present witnesses in his defense. (Dkt. 43-9 at 2).  He appealed his termination, and this appeal was denied on the basis that there was "substantial evidence to support the Carrier's findings of guilt for this serious offense." (Dkt. 43-12 at 4-5).  In addition, the appeal decision references other instances where employees have been terminated for cheating on tests.  (*Id.*).  As a result, Defendants have presented a legitimate, non-discriminatory reason for Plaintiff's termination.

In addition, Defendants have proffered legitimate, non-discriminatory reasons for the requirements that Plaintiff complete retesting and participate in qualifying trips before returning to work.  Specifically, Defendants cite to the importance of re-familiarizing a conductor with the physical characteristics of the territory they will work on as the basis for requiring Plaintiff to take qualifying trips and pass a lines east examination. (Dkt. 51-

9 at 7; Dkt. 43-4 at 37:10-22).  Defendants have also presented legitimate reasons for the delay in scheduling Plaintiff's lines east test and returning Plaintiff to work.  Namely, that Plaintiff's own actions contributed largely to the delay.  (Dkt. 43-4 at 73:3-74:13).

Accordingly, Defendants have presented legitimate, non-discriminatory reasons for any adverse employment actions.

### F.    Pretext

Once the defendants articulate some legitimate, nondiscriminatory reason for the adverse actions, "the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination."  *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010). In other words, a plaintiff must "demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (internal quotations and citation omitted).  If a plaintiff "has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate."  *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (citation omitted).

The Court agrees with the Report and Recommendation that "Plaintiff's failure to present evidence necessary to establish that the alleged adverse employment actions occurred under circumstances giving rise to an inference of discrimination also dooms any attempt to establish that Defendants' articulated legitimate, non-discriminatory reasons were mere pretext to discrimination."  (Dkt. 54 at 29).  In other words, even if

Plaintiff could pass the threshold of establishing a *prima facie* case, the record before the Court plainly fails to support the notion that a reasonable juror could conclude that the proffered reasons were pretextual. Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiff's Title VII claims.

## III.    Section 1981 and NYSHRL Claims

"It is well settled that in discrimination cases where there is no overt evidence of discriminatory conduct, claims brought under Title VII, § 1981, and the NYHRL are analyzed under the burden-shifting analysis first set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)." *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 234 (W.D.N.Y. 2011). Because the Court has adopted the Report and Recommendation to grant summary judgment with respect to Plaintiff's Title VII claims, it need not separately analyze Plaintiff's Section 1981 and NYSHRL claims, as summary judgment with respect to those claims is also appropriate under the *McDonnell Douglas* burden-shifting analysis.

## IV.    Tortious Interference with a Contract

The elements of a tortious interference with a contract claim are: "'(a) that a valid contract exists; (b) that a "third party" had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff.'" *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001) (quoting *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996)).

Plaintiff alleges that Defendant Lewandowski fabricated facts to support a claim against Plaintiff for cheating on the lines east test, being discourteous, and using profane

language in order to ensure that Defendant CSX breached Plaintiff's employment contract, thereby tortiously interfering with the contract. (Dkt. 7 at ¶¶ 109-15).

Defendants contend that because Defendant Lewandowski was an employee of CSX and therefore a party to the alleged agreement tortiously interfered with, Plaintiff cannot sustain his tortious interference claim as a matter of law because Defendant Lewandowski was not a third party to the contract. (Dkt. 43-23 at 17).

The Report and Recommendation concluded that Plaintiff was an at-will employee of Defendant CSX, and that Defendant Lewandowski, an employee of Defendant CSX, would generally not be considered a third party to the contractual relationship between Plaintiff and Defendant CSX. (Dkt. 54 at 37). Further, Plaintiff failed to demonstrate that Defendant "acted outside the scope of his authority when he proctored the lines east test, accused Plaintiff of cheating on the lines east test, or testified at the Investigative Hearing." (*Id.* at 38).

Neither party objects to this finding, and the Court concludes that there was no clear error in the findings of the Report and Recommendation.

## CONCLUSION

For the reasons discussed above, the Court adopts the Report and Recommendation (Dkt. 54). Defendants' motion for summary judgment (Dkt. 43) is granted and Plaintiff's complaint (Dkt. 1) is dismissed with prejudice.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      January 4, 2016
            Rochester, New York